IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Midland National Life Insurance Company, | Case No. 3:13 CV 814 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Tammy M. Gavin, et al., | |
| Defendants. | |

## INTRODUCTION

Plaintiff Midland National Life Insurance Company issued a half-million dollar life insurance policy (the "Policy") to John Christopher Gavin in August 2011. His wife Tammy and children John and Kara (the Defendants) are the listed beneficiaries. In October 2012, Gavin died at the age of 53 from a sudden cardiac incident due to hypertension and hyperlipidemia. Midland filed this declaratory judgment action, asking this Court find Midland has the right to rescind the life insurance policy because Gavin made misrepresentations about his health when he submitted his insurance application.

Pending before this Court is briefing on Midland's Motion for Summary Judgment (Docs. 27–28, 33–34). This Court also held oral argument centered on written questions sent to counsel in advance of the hearing (Doc. 37). This Court then followed up with an evidentiary hearing, supplementing the record with testimony from Timothy Croak and Lorraine Hugle (9/19/14 Dkt. Entry). For the reasons stated below, Midland's Motion is denied.

**BACKGROUND**

**Gavin's Medical History**

In December 2008, Gavin visited Dr. Richard Schwartz, his primary care physician, for several tests (Doc. 28-1 at 16). The tests revealed Gavin had elevated blood sugar and cholesterol, and Dr. Schwartz diagnosed Gavin with non-insulin dependent diabetes, neuropathy, anxiety, depression, and high cholesterol (*id.* at 22). Dr. Schwartz prescribed Ativan to treat Gavin's anxiety and Zocor for his high cholesterol.

In September 2010, Gavin had an incident where he experienced chest pain (Doc. 28-2 at 5). He was examined by cardiologist Dr. Carolyn Gbur, and she recommend Gavin undergo a series of tests. A week later, Gavin saw Dr. Schwartz who also recommended Gavin undergo testing for his heart and other procedures (Doc. 28-2 at 18–20). At that time, Dr. Schwartz diagnosed Gavin with dyslipidemia, atypical chest pain, diabetes, and hypertension (Doc. 28-1 at 90). On September 30, Gavin underwent the first of these tests and procedures when he had a general radiography/chest x-ray to address complaints of shortness of breath and snoring. He also had a nuclear cardiac stress test on October 1. The results were largely normal, although Gavin's blood pressure was elevated during exercise (Doc. 28-2 at 3).

On October 18, Gavin underwent an overnight sleep study with Dr. Frank Horton for snoring and sleep apnea and informed Dr. Horton that he drank between three to five drinks in the evening before going to bed, he was taking Zocor and Avapro (both for high blood pressure) and that he occasionally took Omeprazole (commonly known as Prilosec) to treat acid reflux (Doc. 28-3 at 55). Dr. Horton suggested that Gavin consider decreasing his alcohol intake to improve the quality of his sleep (Doc. 28-3 at 8). In a follow up appointment, Dr. Gavin diagnosed Gavin with severe

2

obstructive sleep apnea and recommended that Gavin use a CPAP machine at night at selected settings (Doc. 28-3 at 19–21). Medical records suggest Gavin was using a nasal CPAP on a trial basis in November 2010 (Doc. 28-2 at 42).

In January 2011, Gavin had a colonoscopy with normal results (Doc. 28-2 at 21–22). Gavin saw Dr. Schwartz for a follow up appointment in March, and, as part of the exam, had blood work performed. The results showed that Gavin's diabetes was under control through diet and exercise (Doc. 28-2 at 28). Dr. Schwartz noted that Gavin had not had any chest pain since his last visit (Doc. 28-2 at 14). Gavin again visited Dr. Schwartz in April (Doc. 28-2 at 11–13), and on April 27, Gavin attended a diabetes self-management education session at Toledo Hospital (Doc. 28-2 at 27).

**Gavin's Application for Life Insurance**

During the summer of 2011, Gavin purchased life insurance from Timothy Croak, a longtime friend and neighbor who sold insurance (9/19/14 Draft Tr. at 35, 38–39). The General Purpose Life Application for Insurance ("Application") consisted of three components (Doc. 28-4, Application). Gavin completed Part I on June 20 and Parts II and III on July 22.

Part I asked Gavin for biographical and employment information, as well as information about the beneficiaries (Doc. 28-4 at 1–3). It also asked Gavin to provide contact information for any licensed medical professional consulted in the last five years, and the date and findings of the most recent visit (*id.* at 5). Gavin disclosed Dr. Schwartz, stating that the most recent visit was a physical in March 2011 including a "full blood work up" with "all normal" results (*id.*). By signing Part I of the Application, Gavin authorized Midland to contact any health care provider, pharmacy, or insurance provider to obtain information about Gavin's medical conditions and prescription history

3

(*id.* at 7). Croak told Gavin that the insurance carrier would pull his medical records and that "[w]hatever you've got they're going to find it" (Draft Tr. at 70–71).

Midland's designated medical examiner completed Parts II and III of the application. Midland sent Gavin to Lorraine Hugle, a paramedic with American Paraprofessional Systems, for an examination on July 22, 2011 (Draft Tr. at 4). Gavin again provided Hugle with the contact information for Dr. Schwartz which Hugle recorded in Part II and also noted that Gavin's last visit was March 19, 2011 for a "routine physical" and the results were "within normal limits" (Doc. 28-4 at 8; Draft Tr. at 21). In Questions 2–4, Gavin revealed his health history by answering standard questions (posed to him by Hugle), including answering "No" to the following questions (Draft Tr. at 9–10):

> 2. In the past 10 years, have you ever had or been diagnosed by a licensed medical professional, treated or advised to get treatment from a licensed medical professional, hospitalized, or presently taking prescription(s) or medication(s) for any of the following disease(s) or disorder(s):
>
> (a) Angina, chest pain, heart attack, heart failure, heart surgery, irregular heartbeat, abnormal EKG, coronary artery bypass, angioplasty, stents, peripheral vascular disease, poor circulation, valvular heart disease, cardiomyopathy or heart murmur?
>
> (g) Chronic obstructive pulmonary or lung disease, chronic bronchitis, emphysema, sarcoidosis, asthma, shortness of breath, tuberculosis or sleep apnea?
>
> (h) Diabetes, abnormal blood sugar, sugar in the urine, disease or disorders of the adrenal, parathyroid, pituitary or thyroid glands?
>
> * * *
>
> (m) Depression, anxiety, stress, eating disorder or any other nervous, mental or emotional condition?

>3. Other than indicated above, have you:
>
>>(b) Been advised by a licensed medical professional to limit your alcohol use . . . .
>
>>\* \* \*
>
>>(e) In the past 12 months been advised by a licensed medical professional to have a check up, EKG, X-ray, blood or urine test or any other diagnostic test or are you now planning to seek medical advise [sic] or treatment for any reason?
>
>>\* \* \*
>
>4. Are you currently taking any prescription medications, herbal remedies or non-prescription medications for any disease or disorder not listed above?

Hugle testified that if she had observed something during her examination of Gavin that was contrary to his responses to questions, she would have recorded such observations (Draft Tr. at 29).

To complete Part III of the Application, titled the "Medical Examiner's Report," Hugle recorded Gavin's vitals, including height, weight, chest circumference, abdomen circumference, blood pressure, and heart rate (Doc. 28-4 at 9). Hugle also took a blood and urine sample and then certified her exam by signing the bottom of the page (*id.*; Draft Tr. at 23). Gavin signed another authorization, once again allowing Midland to access his medical records (Doc. 28-4 at 10).

**The Policy and Midland's Post-Death Investigation**

Midland issued Gavin the half-million dollar Policy on August 13, 2011, requiring a monthly premium of $146.44 (Doc. 28-5). The Policy included a provision that allowed Midland to contest a claim if Gavin died within two years after issuance (*id.* at § 3.13). Gavin died on October 10, 2012, fourteen months after Midland issued the Policy. After Gavin's death, Midland requested, for the first time, his medical records. Based on a review of those medical records, Midland's Underwriting Department states it would not have approved the Policy (Docs. 28-8 & 28-10). Midland then sent

letters to each Defendant rescinding coverage under the Policy, deeming it null and void from the date of issue, and tendered to Defendants a full refund of the paid premiums which Defendants cashed (Doc. 28-13).

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

## DISCUSSION

**Rescission under R.C. § 3911.06**

In Ohio, claims involving the rescission of a life insurance policy due to false statements are governed by R.C. § 3911.06, which provides:

> No answer to any interrogatory made by an applicant in his application for a policy shall bar the right to recover upon any policy issued thereon, or be used in evidence at any trial to recover upon such policy, **unless it is clearly proved that such answer is willfully false, that it was fraudulently made, that it is material, and that it induced the company to issue the policy, that but for such answer the policy would not have been issued, and that the agent or company had no knowledge of the falsity or fraud of such answer**. (Emphasis added).

The Ohio Supreme Court has held that an insurance company must "clearly prove" the following when it refuses to honor a policy under R.C. § 3911.06: (1) the applicant willfully gave a false answer; (2) the answer was made fraudulently; (3) but for such an answer the policy would not have been issued; and (4) neither the insurer nor its agent had any knowledge of the falsity of such answer. *Jenkins v. Metro. Life Ins. Co.*, 171 Ohio St. 557, syllabus ¶ 1 (1961).

A false answer creates a presumption that the answer was made willfully. *See Spencer v. Minn. Life Ins. Co.*, 493 F. Supp. 2d 1035, 1038 (S.D. Ohio 2007) ("[A]n insurer, when seeking relief under 3911.06 is not required to prove fraudulent *intent*. To the contrary, all the company has to do is simply show that the applicant knowingly provided a false answer.") (emphasis in original). False answers given by an applicant for insurance create a presumption beneficial to the insurance company. Specifically, where a statement is "falsely made with respect to a material matter, it will be presumed to have been made willfully and with intent to deceive," *i.e.*, that the statement was fraudulent under the statute. *Id.* (quoting *Lyttle v. Pacific Mut. Life Ins. Co.* 72 F.2d 140, 142 (6th Cir. 1934)).

Ohio law provides two narrow means for a claimant to rebut this presumption -- by (1) putting forward "evidence tending to prove, if not the burden of proving, that the [omitted physician consultation and/or diagnosis] was not known by the [applicant] to be for any serious ailment or condition"; or (2) putting forward evidence that "the false answer was an honest mistake." *See id.* (quoting *Jenkins*, 171 Ohio St. at 563).

The parties do not dispute the falsity and materiality of Gavin's answers and, by operation of law, Midland receives a presumption that the application was fraudulent. Thus Defendants must cite evidence showing that Gavin either (1) did not appreciate the seriousness of his diagnoses or (2) made an honest mistake.

7

Midland contends Gavin fraudulently answered "no" to the questions whether in the past 10 years he had been diagnosed by or advised to get treatment for "[d]iabetes, abnormal blood sugar, [or] sugar in the urine," "[a]ngina, chest pain . . . irregular heartbeat, abnormal EKG . . . [or] cardiomyopathy," "sleep apnea," and "[d]epression, anxiety, [or] stress." However, the evidence suggests Gavin did not believe or appreciate that his diagnoses were serious or long lasting.

At the hearing, Croak testified that he was "shocked" when his longtime friend died and that he believed Gavin "didn't realize the severity of some of the things that he had" (Draft Tr. at 79–80). Croak also testified he told Gavin that the insurance carrier would pull all of his medical records as part of its review process. While Gavin had been diagnosed with high blood sugar and received counseling on blood sugar management, records indicate his blood sugar was controlled with diet (*see* Doc. 28-2 at 28), and he was not taking insulin. Further, as part of Midland's medical examination, Hugle took blood and urine samples from Gavin (Doc. 28-4 at 9). This evidence raises a question of fact whether Gavin understood that he had diabetes or understood the question to mean he was to report his high blood sugar.

In addition, after Gavin experienced chest pain in September 2010, testing revealed no substantial cardiac irregularities, other than high cholesterol, also calling into question whether he believed he suffered from a cardiac condition of the nature that would need to be reported to Midland. While Gavin was diagnosed with sleep apnea and anxiety, the record does not establish he regarded himself as suffering from these conditions such that they were serious or a health hazard. Gavin underwent the sleep studies about ten months prior to the issuance of the Policy, and the record is unclear on what Gavin understood his diagnosis to be and what continued treatment he may have been undergoing. These ambiguities, coupled with Croak's assurances that Midland was going to engage

8

in an independent review of Gavin's records, creates a question of fact, rendering summary judgment inappropriate.

Midland also contends Gavin falsely answered "no" to whether he had "[b]een advised by a licensed medical professional to limit your alcohol use or been advised to get, or undergone any treatment or counseling or hospitalization for alcoholism, excessive alcohol use or abuse? . . . Or, drink on average more than 3 alcoholic drinks per day?" But, the only evidence in the record relating to alcohol is Dr. Horton's recommendation that Gavin reduce or eliminate alcohol consumption before bedtime for a better night's sleep. The context of the compound question suggests it seeks to elicit information about whether Gavin had been treated for alcohol abuse or alcoholism, and no record evidence suggests he was treated for either.

The entire record, and not just Gavin's answers to Midland's questions, reveals Gavin may not have appreciated his medical history posed serious medical issues. Reasonable minds could differ whether his answers were willfully false and fraudulent.

**Accord and Satisfaction**

Midland also argues it is entitled to summary judgment because Defendants cashed the premium reimbursement checks, totaling $2,075.92, which Midland sent to them prior to filing suit.

"Accord and satisfaction is an affirmative defense to a claim for money damages. If a party against whom a claim for damages is made can prove accord and satisfaction, that party's debt is discharged by operation of law." *Allen v. R.G. Indus. Supply*, 66 Ohio St. 3d 229, 331 (1993). For an accord and satisfaction to be established, it must be shown "(1) that the parties went through the process of offer and acceptance—an accord, (2) that the accord was carried out—a satisfaction, and (3) that the agreement was supported by consideration." *Citibank, N.A. v. Perz*, 191 Ohio App. 3d

9

575, 584–85 (2010) (quoting *Allen*, 66 Ohio St. 3d at 231–32). The party must also show that at the time the offer was made, the claim was "unliquidated or subject to a bona fide dispute." R.C. § 1303.40. And "[w]hen the accord and satisfaction relates to the cashing of the check, the [payee] must have reasonable notice that the check is intended to be in full satisfaction of the debt." *Tourville v. Terzuoli*, 2009-Ohio-2743, ¶ 12 (Ohio Ct. App. 2009) (internal citations and quotation marks omitted). "The simple fact that a [party] cashes the check does not indicate accord and satisfaction." *Id.*

Midland contends that its March 2013 letters to Defendants declaring Gavin's Policy null and void and including a refund of the premiums Gavin had paid, together with Defendants' cashing those checks, constituted an agreement negating the Policy. Midland argues that a bona fide dispute existed between Defendants and Midland, and that Midland sufficiently put Defendants on notice by including the following statement in the letters: "Enclosed is a check for your portion of the return of premiums paid into the Policy, plus interest, which is the extent of our liability." (Doc. 28-13 at 3).

This Court rejects these arguments. The statement is insufficient as a matter of law to put Defendants on notice that the cashing of the checks was intended to be satisfaction of Defendants' claim. *See Terzuoli*, 2009-Ohio-2743 at ¶ 12. Further, at a minimum, there is an issue of fact that at the time the checks were issued, they represented a settlement agreement to a bona fide dispute. *See Warner Elevator Mfg. Co. v. Higbee*, 53 Ohio App. 546, 548 (1935) ("An accord and satisfaction is the result of an agreement between the parties, and this agreement, like all others, must be consummated by a meeting of the minds of the parties.").

**CONCLUSION**

This case is a close call, and this Court has struggled with the right result. This Court believes a jury could well agree with Midland, but that it could also agree with Defendants. For the foregoing reasons, Midland's Motion for Summary Judgment (Docs. 27–28) is denied.

IT IS SO ORDERED.

                                                   s/ *Jack Zouhary*
                                                   JACK ZOUHARY
                                                   U. S. DISTRICT JUDGE

                                                   December 31, 2014